FILED
06/26/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 4, 2024 Session

## KENNETH R. BURD, JR. v. CHRISTOPHER MICHAEL RICHEY ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 22-0926-BC     Anne C. Martin, Chancellor**

_____

**No. M2023-00252-COA-R3-CV**

_____

To facilitate the sale of two closely held companies, an employee signed a restrictive covenant agreement containing a release provision. After the sale, the employee filed suit against the buyer, the seller, and others involved in the sale, alleging that he had been defrauded out of his ownership interest in the companies. Later, the employee dismissed the corporate defendants and filed an amended complaint reasserting claims against his alleged former co-owners for intentional misrepresentation, fraudulent concealment, and breach of fiduciary duty in connection with the sale. The defendants moved to dismiss the complaint based on the release provision. Concluding that the language of the release was broad enough to encompass the claims in the amended complaint, the court granted the motion to dismiss. We affirm.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Kristen M. Shields, Christopher Beverly, and Caleb Conner, Mt. Juliet, Tennessee, for the appellant, Kenneth R. Burd.

Stephen C. Knight and Nader Baydoun, Brentwood, Tennessee, for the appellees, Christopher Michael Richey and Kindred Shay Smith.

# OPINION

## I.

### A.

On November 12, 2021, Greenrise Technologies, Inc., through a subsidiary, purchased a controlling membership interest in two limited liability companies, Mid-TN Erosion and Sediment Control, LLC and Mid-TN Erosion Products, LLC, for a total purchase price of $18 million. According to the unit purchase agreement,[1] Chris Richey was the sole owner of the predecessor companies, Mid-TN Erosion and Sediment Control, Inc. and Mid-TN Erosion Products, Inc. Immediately before the sale, Mr. Richey transferred the capital stock in the two predecessors to two holding companies he had formed for this purpose. The predecessor companies were then converted to Delaware limited liability companies.

After the sale, Ken Burd, a former employee of the predecessors, sued Greenrise Technologies and a host of others, alleging that he had been defrauded out of his ownership interest in the companies. According to the complaint, Mr. Richey formed these companies in the early 2000s. For many years, Mr. Burd managed and operated the companies on Mr. Richey's behalf. In 2013, Mr. Richey gave Mr. Burd a 25% ownership interest in Mid-TN Erosion and Sediment Control and a 50% ownership interest in Mid-TN Erosion Products. The companies prospered under their joint ownership and direction. By 2019, Mid-TN Erosion and Sediment Control "was grossing in excess of $15,000,000.00 annually."

Shay Smith, through his consulting firm, Sterling Consulting Services, PLLC, "served as advisor, attorney, and CPA for the [c]ompanies." He also provided legal and accounting services to Mr. Burd individually. Mr. Burd relied on Mr. Smith "to prepare his personal tax filings and to guide . . . his financial decisions." Mr. Smith also prepared legal documents for Mr. Burd's business ventures.

In late 2020, Mr. Smith offered to close his consulting business and devote himself to growing the erosion control business. Mr. Richey and Mr. Burd agreed. Under the new arrangement, Mr. Smith received a generous employee salary and a 25% ownership interest in Mid-TN Erosion and Sediment Control.

In September 2021, the three owners met for breakfast. Mr. Smith announced that Greenrise had offered $15 million for 100% of the shares in the two erosion companies. He explained that Greenrise did not intend to keep the current owners involved in the

---

[1] The unit purchase agreement was attached as an exhibit to the original and amended complaints.

companies after the sale. Mr. Burd alleged that these representations were false. He also alleged that Mr. Smith misled him about other terms of the offer, such as the "treatment of employees after the sale and the continuation of certain benefits that the owners had received." Mr. Richey did not correct any of Mr. Smith's misrepresentations. He told Mr. Burd that they had no choice but to agree to the sale. Otherwise, "Greenrise would 'squash' them." Mr. Smith allegedly made other misrepresentations over the following days and weeks to induce Mr. Burd to agree to the sale.

At or before closing, Mr. Smith asked Mr. Burd to sign a restrictive covenant agreement with Greenrise "to complete his part in the sale." A copy of the signed agreement was attached as an exhibit to the complaint. Mr. Richey and Mr. Smith assured Mr. Burd that "he would receive a payout amount that corresponded to his ownership interest in the two companies." After he signed the agreement, they gave him a check, which they represented as his portion of the sale proceeds.

Mr. Burd later discovered that Greenrise had not paid $15 million, but $18 million, for an 88.88% interest in the two companies. He also learned that his former co-owners received ownership interests in the successor entities as well as substantial salaries for continued employment. Given this new information, Mr. Burd claimed that he was paid substantially less than he deserved for his shares in the two companies.

## B.

The original complaint named Mr. Richey and Mr. Smith as defendants, as well as Greenrise, a Greenrise subsidiary, the two limited liability companies, their corporate predecessors, and the two holding companies. Mr. Burd claimed that the defendants engaged in a conspiracy to defraud him of his ownership interest in the erosion companies. Alleging that Greenrise and its agent, Mr. Smith, fraudulently induced him to sign the restrictive covenant agreement, Mr. Burd asked the court to declare the agreement void and unenforceable. He also sought compensatory and punitive damages from Mr. Richey and Mr. Smith for intentional misrepresentation, fraudulent concealment, and breach of fiduciary duty.[2]

The defendants moved to dismiss for failure to state a claim. Among other things, they argued that Mr. Burd's action was barred by the release provision in the restrictive covenant agreement. And, to the extent he sought to avoid enforcement of the agreement, he was required to "tender back" the consideration he received in exchange for his signature. *See Gibbons v. Mut. Ben. Health & Accident Ass'n*, 259 S.W.2d 653, 654 (Tenn.

---

[2] As an alternative to his ownership claim, he alleged an implied partnership with Mr. Richey. He asked the court to dissolve the partnership and distribute its assets between the partners. He also sought an accounting and access to the books and records of the limited liability companies and their predecessor companies.

3

1953) (recognizing that "money received in settlement . . . must be returned or tendered back as a prerequisite to the maintenance of a suit to avoid such settlement because of alleged fraud in its procurement").

Pointing to the fraud allegations in the complaint, Mr. Burd insisted that the restrictive covenant agreement was unenforceable. So he was not bound by the language of the release. In his view, the defendants' reliance on the tender rule was misplaced. Still, should the court decide that the agreement was enforceable, he argued that the release did not bar his claims.

The trial court agreed that the complaint failed to state a claim against Greenrise and its subsidiary. It dismissed the claims against them with prejudice. But it denied the remaining defendants' motions "at this time." It recognized "the general rule that a release may be set aside if it was procured by fraud." Here, the allegations in the complaint stated a claim for fraudulent inducement. Even so, Mr. Burd received a substantial payment in exchange for executing the restrictive covenant agreement. Under these circumstances, it was incumbent upon Mr. Burd to comply with the tender rule before he could avoid the agreement and pursue his claims. In lieu of dismissal, the court directed Mr. Burd to "tender back the consideration and file a motion to amend within forty-five (45) days of this Order." Otherwise, the court would entertain a renewed motion to dismiss from the remaining defendants.

Mr. Burd moved to alter and amend the court's ruling. *See* TENN. R. CIV. P. 54.02. Arguing that the release did not apply to his claims against Mr. Richey and Mr. Smith, he asked the court "to clarify" that he was not required to tender back any funds to pursue them. He also asked the court to modify the dismissal of the claims against the Greenrise defendants to a dismissal without prejudice.

A few days later, he voluntarily dismissed his claims against the corporate defendants and filed an amended complaint naming Mr. Richey and Mr. Smith as the sole defendants. The amended complaint restated the claims for intentional misrepresentation, fraudulent concealment, and breach of fiduciary duty. But it did not allege that the restrictive covenant agreement was unenforceable or seek to rescind it.

Asserting that the release barred the amended claims and that Mr. Burd never complied with the tender rule, Mr. Richey and Mr. Smith filed a renewed motion to dismiss. Mr. Burd responded that he was not seeking to avoid the release, so the tender back rule was irrelevant. He insisted that the release, by its plain terms, did not apply to the amended claims.

The court denied the motion to alter or amend and granted the renewed motion to dismiss. It determined that the release "language [was] broad enough to include those claims set forth in the First Amended Complaint." Mr. Burd's underlying complaint was

4

that he was defrauded out of his ownership interest in the two erosion companies. In the court's view, the claims he asserted in the amended complaint "relate[d] to, ar[o]se out of, or [had a connection] with" his current or future claims against the successor entities.

## II.

Mr. Burd contends that the trial court erred in dismissing his amended complaint based on the release provision in the restrictive covenant agreement. If this Court reverses the dismissal, he asks for a determination that the "tender rule" does not apply under these circumstances.

A Rule 12.02(6) motion "challenges only the legal sufficiency of the complaint." *Webb v. Nashville Area Habitat for Human., Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). It does not challenge the strength of the plaintiff's proof or evidence. *Id.* Thus, "[t]he resolution of a 12.02(6) motion to dismiss is determined by an examination of the pleadings alone." *Id.* This includes the "exhibits attached to the complaint," which are "considered part of the pleading." *Pagliara v. Moses*, 605 S.W.3d 619, 625 (Tenn. Ct. App. 2020) (citing TENN. R. CIV. P. 10.03).

When faced with a Rule 12.02(6) motion, the court must "construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002). The complaint should not be dismissed "unless it appears that the plaintiff can establish no facts supporting the claim that would warrant relief." *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999). This determination presents a question of law, which we review de novo, with no presumption of correctness. *Id.*

Here, the motion to dismiss was based on an affirmative defense. *See* TENN. R. CIV. P. 8.03. Thus, dismissal is appropriate only if the "affirmative defense clearly and unequivocally appears on the face of the complaint." *Anthony v. Tidwell*, 560 S.W.2d 908, 909 (Tenn. 1977). The plaintiff's allegations must "show that an affirmative defense exists and that this defense legally defeats the claim for relief." *Jackson v. Smith*, 387 S.W.3d 486, 492 (Tenn. 2012).

### A.

We begin with Mr. Burd's contention that the court erred in failing to recognize and apply a presumption of invalidity to the restrictive covenant agreement. He claims the presumption arises from his confidential relationships with Mr. Richey and Mr. Smith. He asks this Court to declare the agreement invalid and reverse the dismissal or, at least, to vacate the dismissal and instruct the trial court to reconsider its decision in light of this presumption.

5

We question whether the presumption of invalidity has any application here. Transactions between individuals in a confidential relationship are presumptively invalid. *Sec. Fed. Sav. & Loan Ass'n of Nashville v. Riviera, Ltd.*, 856 S.W.2d 709, 714 (Tenn. Ct. App. 1992). But the restrictive covenant agreement at issue was between Greenrise and Mr. Burd. Nothing in the amended complaint suggests that Mr. Burd and Greenrise had a confidential relationship.

More importantly, the record reflects that Mr. Burd abandoned the validity issue when he filed his amended complaint. The amended complaint does not assert that the restrictive covenant agreement was invalid or unenforceable. *See Christian v. Lapidus*, 833 S.W.2d 71, 73 (Tenn. 1992) (stating that when an amended complaint does not refer to or adopt the original, it effects an abandonment of omitted claims). Nor did he raise this issue in response to the renewed motion to dismiss. Given Mr. Burd's tactical decision to abandon this issue in the trial court, we decline to grant him relief on this basis. *See* TENN. R. APP. P. 36(a).

## B.

Resolution of this appeal turns on the scope of the release provision in the restrictive covenant agreement. Contract interpretation presents a question of law, which we review de novo with no presumption of correctness. *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). We "look to the plain meaning of the words in the document" to determine its scope. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *see Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (recognizing that "[t]he intent of the parties is presumed to be that specifically expressed in the body of the contract"). We "give primacy to the contract terms, because the words are the most reliable indicator—and the best evidence—of the parties' agreement." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019). If the release provision is "clear and unambiguous, the literal meaning controls the outcome of the dispute." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008).

The restrictive covenant agreement contains this release language:

> Release. In consideration for the proceeds to be received, directly or indirectly, by [Mr. Burd] . . . in connection with the transactions consummated in accordance with this Agreement and the Purchase Agreement, and for such other good and valuable consideration, . . . effective as of the Closing **(the "Effective Time")**, [Mr. Burd], . . . hereby fully and unconditionally releases, acquits and forever discharges the Buyer, the Company and each of their respective past, present and future successors, predecessors, assigns, employees, employee benefit plans, agents, partners, members, managers, directors and officers (corporate or otherwise) and other

6

Representatives **(collectively, the "Releasees")** from any and all claims, actions, causes of action, suits, damages, judgments, expenses, demands and other obligations or Liabilities of any kind or nature whatsoever, known or unknown, fixed or contingent, past, present or future, in law or in equity, relating to, arising out of, or in connection with any claims that [Mr. Burd] may now have or may in the future have against the Company or their respective subsidiaries, relating to any events occurring prior to the Effective Time **(collectively, the "Released Claims")** and [Mr. Burd] shall not be entitled to recover and covenants not to sue to recover, and shall not encourage any Person to, directly or indirectly seek to recover any amounts in connection therewith or thereunder from the Releasees. . . . .

While broadly worded, the release has specific limitations. It only protects a distinct list of "Releasees" from claims that meet the criteria for "Released Claims." We will not expand the scope of the release beyond its plain terms. *See Cross v. Earls*, 517 S.W.2d 751, 752 (Tenn. 1974) (stating "a release confined to particular matters or causes operates to release only such claims as fairly come within the terms of the release").

1. The List of "Releasees"

Mr. Burd argues that Mr. Richey and Mr. Smith do not fall within the expansive list of "Releasees." The release provision identifies the "Releasees" as the "Buyer, the Company and each of their respective past, present and future successors, predecessors, assigns, employees, employee benefit plans, agents, partners, members, managers, directors and officers (corporate or otherwise) and other Representatives." Two of the capitalized terms on this list are specifically defined elsewhere in the agreement. The "Buyer" is identified as Greenrise, and "Company" refers to the two limited liability companies. Despite the capital letter, "Representatives" is not a defined term.

Mr. Burd insists the release provision must be read narrowly given the definition of "Company," which excludes his former companies. But, as a matter of law, the two converted entities and their predecessor corporations are deemed to be one and the same. *See* Tenn. Code Ann. § 48-21-114(a)(7)(B) (2019) (providing that after conversion, "the survivor is deemed to . . . [b]e the same corporation or unincorporated entity without interruption as the converting entity"); Del. Code Ann. tit. 6, § 18-214(g) (West, Westlaw through ch. 30 of the 153rd Gen. Assemb.) ("When an other entity has been converted to a limited liability company pursuant to this section, for all purposes of the laws of the State of Delaware, the limited liability company shall be deemed to be the same entity as the converting other entity and the conversion shall constitute a continuation of the existence of the converting other entity in the form of a domestic limited liability company."). So the term "Company" must also include the predecessor companies.

Mr. Burd's next argument relies on the list's punctuation. He reminds us that commas are often used to separate items in a series. *See White v. State Farm Mut. Auto. Ins. Co.*, No. W2019-00918-COA-R3-CV, 2020 WL 886139, at *4 (Tenn. Ct. App. Feb. 24, 2020); BRYAN A. GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE § 1.3 (3d ed. 2013). So he posits that the comma after "Buyer" signals a separation from the rest of the list while the lack of a comma after "Company" indicates a connection between that term and the rest of the list. Likewise, he contends that the comma after the term "successors" signifies another break in the series. In his view, this break means that the adjectives "past, present and future" modify the term they immediately precede, "successors," but none of the remaining items on the list.[3] As a result, he maintains that the only "Releasees" are (1) the Buyer, (2) the Company, and (3) the Company's "past, present and future" successors, (4) the Company's predecessors as of the date the agreement was executed, (5) the Company's assigns on that date, and so on.

Mr. Burd places undue emphasis on a quirk of punctuation. *See Ewing's Lessee v. Burnet*, 36 U.S. 41, 54 (1837) (explaining that "[p]unctuation is a most fallible standard by which to interpret a writing; it may be resorted to, when all other means fail; but the court will first take the instrument by its four corners, in order to ascertain its true meaning; if that is apparent, on judicially inspecting the whole, the punctuation will not be suffered to change it"). Given the lack of commas before any of the conjunctions in the release provision, the obvious explanation for these punctuation choices is that the drafter opted not to use a "serial" or "Oxford" comma. *See* BRYAN A. GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE § 1.3 (3d ed. 2013) (expressing preference for use of a serial comma); *White*, 2020 WL 886139, at *5 (noting the "debate in academics concerning the necessity of the so-called Oxford or Serial Comma"). Simple common sense tells us this much. *See Barnes v. Black Diamond Coal Co.*, 47 S.W. 498, 499 (Tenn. 1898) (instructing courts to apply common sense when interpreting a contract "rather than any technical rules of construction").

Unlike Mr. Burd, we see no need to resort to technical rules of punctuation to discern meaning here. The Releasees include "the Buyer, the Company and each of their respective past, present and future successors, predecessors, assigns, employees," and so on. Basic grammar rules dictate that "Buyer" and "Company" are the antecedents for the plural possessive adjective "their" that follows. Although "Company" is defined collectively, it is used in this passage as a singular noun. The temporal adjectives "past, present and future" appear immediately before a straightforward list of parallel nouns. These modifiers apply naturally to all the items in the series. There are no syntax clues suggesting otherwise. So we conclude that these adjectives modify all the items in the series, not just the closest one. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE

---

[3] Mr. Burd assigns no particular significance to the commas within the group of adjectives, "past, present and future."

INTERPRETATION OF LEGAL TEXTS 147 (2012) (discussing the series-qualifier canon); *Bearing Distribs., Inc. v. Gerregano*, No. M2020-01075-COA-R3-CV, 2022 WL 40008, at *7 (Tenn. Ct. App. Jan. 5, 2022) (noting that Tennessee courts have applied this "longstanding canon").

Thus, we conclude that the list of "Releasees" includes: (1) the Buyer, (2) the Company, and (3) each of the Buyer's and the Company's "respective past, present and future successors, predecessors, assigns, employees, employee benefit plans, agents, partners, members, managers, directors and officers (corporate or otherwise) and other Representatives." Based on the allegations of the amended complaint, Mr. Richey and Mr. Smith fall within several categories on this list.

Mr. Richey is a "Releasee" because he was an "agent" or "other Representative" of the predecessor companies and an "employee" of the successor entities. According to the amended complaint, Mr. Richey was "authorized to, and did, sign legal documents on behalf of the [predecessor] Companies"; he made "financial decisions on behalf of the [predecessor] Companies," and "sign[ed] checks and access[ed] financial accounts on behalf of the [predecessor] Companies." He was also "employ[ed] with the successor entities."

Mr. Smith is a "Releasee" based on his status as an "employee," "agent," or "other Representative" of the predecessor companies as well as an "employee" and "member" of the successor entities. The amended complaint alleged that Mr. Smith "served as advisor, attorney, and CPA for the [predecessor] Companies" and eventually became a salaried employee. He also "receiv[ed] a salar[y] of $200,000.00 from the successor entities" after the sale. According to the unit purchase agreement, Mr. Smith was also a "member" of the successor entities after the sale.[4]

2. The Definition of "Released Claims"

The release provision is also limited to specific claims. "Released Claims" must meet two criteria. They must "relat[e] to, aris[e] out of, or [have a] connection with" a claim Mr. Burd may have now or in the future against the "Company." And they must fall within a specific time frame.

Mr. Burd concedes, as he must, that the phrase "relating to, arising out of, or in connection with" is broad. *See Castillo v. Rex*, No. E2022-00322-SC-R11-CV, 2025 WL 1349894, at *6 (Tenn. May 9, 2025) (acknowledging that "relating to" has a broad meaning). Even so, he insists that his current claims are unrelated to any claim against the

---

[4] Although the amended complaint alleged that both defendants received an ownership interest in the successor entities, the unit purchase agreement reflects that Mr. Richey's ownership interest is indirect. So he is not a "member."

"Company," as that term is defined in the agreement. As we previously explained, the limited liability companies and their predecessors are not legally distinct for these purposes. Any claim Mr. Burd may have against his former companies may be asserted against the successor entities. *See* Tenn. Code Ann. § 48-21-114(a)(2) (providing that after the conversion, "[a]ll obligations and liabilities of the converting entity continue as obligations and liabilities of the survivor"); Del. Code Ann. tit. 6, § 18-214(f) (providing that "all rights of creditors . . . of such other entity shall be preserved unimpaired, and all debts, liabilities and duties of the other entity that has converted shall remain attached to the domestic limited liability company to which such other entity has converted, and may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a domestic limited liability company").

Despite Mr. Burd's protests, we conclude that his claims against Mr. Richey and Mr. Smith are clearly related or connected to a claim he may have now or in the future against his former companies based on his loss of ownership and employment. *See Lacy v. Vanderbilt Univ. Med. Ctr.*, No. M2016-02014-COA-R3-CV, 2017 WL 6273316, at *6 (Tenn. Ct. App. May 4, 2017) ("In its natural and ordinary usage, the phrase "related to" simply means connected to in some way."). He alleged that these individuals misrepresented the terms of Greenrise's offer to purchase the two erosion companies and fraudulently concealed material facts about the transaction, including the personal benefits they received. He also alleged that they breached their fiduciary duties when they placed their personal interests ahead of his during the sale negotiations and concealed the true nature of the transaction. Had he known the truth, Mr. Burd claims he would have refused to participate in the sale or sign the restrictive covenant agreement. As a result of this misconduct, he allegedly received less than he was owed for his ownership shares and continues to incur a loss of income and business opportunities due to the restrictions in the restrictive covenant agreement.

3. The Time Restriction

There is also a time element to the release. The released claims must "relat[e] to . . . events occurring prior to the Effective Time," which is defined as the "Closing." We know from other provisions in the agreement that the referenced closing is the closing of the sale to Greenrise, which occurred on November 12, 2021.

Mr. Burd argues that the definition of "Company" further restricts this time frame. In his view, the release can only apply to claims related to events that occurred during the two-day window between the formation of the limited liability companies and the closing. We find this argument unpersuasive as it misapprehends the legal effect of the conversion of the former corporations. *See generally* Tenn. Code Ann. § 48-21-114; Del. Code Ann. tit. 6, § 18-214.

Without question, most of the claims in the amended complaint relate to events that occurred before closing. Yet, Mr. Burd contended at oral argument that some of his claims merited closer inspection. Specifically, the amended complaint alleged that "[e]ven after the sale of the Companies was completed, [the defendants] continued to mislead Plaintiff so that Plaintiff would not discover their misbehavior." Mr. Burd argues that his claims of continuing deception should survive the motion to dismiss. But these claims are also barred by the release because the alleged misconduct—concealing the truth about the terms of the sale—relates to events that occurred before the closing.

C.

We find Mr. Burd's remaining arguments equally unavailing. He suggests that the release only bars claims against the "Releasees" in their official capacities. Thus, it does not apply to his amended claims, which are based on the defendants' individual misconduct. The release provision is not so limited. It covers "any and all claims . . . of any kind or nature whatsoever, known or unknown, fixed or contingent, past, present or future, in law or in equity." We decline to place an added gloss on the plain language in the agreement. *See Pylant v. Spivey*, 174 S.W.3d 143, 152 (Tenn. Ct. App. 2003) ("Courts must avoid rewriting an agreement under the guise of interpreting it.").

Lastly, Mr. Burd submits that Mr. Richey and Mr. Smith cannot enforce the release against him because they signed identical restrictive covenant agreements. This argument ignores the plain language of the release provision:

> The releases contained in this paragraph are for the benefit of the Releasees and shall be enforceable by any of them directly against the Restricted Party. Each of the Releasees shall be an intended third-party beneficiary of this paragraph and is entitled to directly enforce the releases contained herein.

**III.**

We conclude that the claims in the amended complaint are barred by the release provision in the restrictive covenant agreement. So we affirm the dismissal.

_____ s/ W. Neal McBrayer _____
W. NEAL MCBRAYER, JUDGE

11